IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM JORDAN, | ) | Case No. 1:19-cv-2392 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

## I.    Introduction

Plaintiff, William Jordan, seeks judicial review of the final decision of the Commissioner of Social Security, denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 11.  Because Jordan has failed to show that his "new evidence" is chronologically relevant to his claims, his request for a Sentence Six remand must be denied.  Nevertheless, the ALJ failed to apply proper legal standards in weighing Dr. Rhiew's opinion; that failure was harmless only with respect to the August 2013 through March 2015 RFC period but not the March 2015 through November 2018 RFC period; and the ALJ otherwise applied proper legal standards and reached a decision supported by substantial evidence in evaluating Dr. Khooblall's opinion and Jordan's left shoulder impairment.  Accordingly, the ALJ's decision: (1) concluding that Jordan was not

disabled from August 15, 2013 through March 5, 2015 must be affirmed; and (2) concluding that Jordan was not disabled from March 6, 2015 through November 14, 2018 must be vacated and remanded for the ALJ to apply proper legal standards in the evaluation of Dr. Rhiew's opinion.

## II.    Procedural History

Jordan applied for DIB and SSI on July 1, 2014.  (Tr. 181, 441-63).[1]  Jordan alleged that he became disabled on August 15, 2013, due to herniated discs in his lumbar spine, arthritis in his back, high blood pressure, and a learning disability.  (Tr.181).  The Social Security Administration denied Jordan's claim initially and upon reconsideration.  (Tr. 181-241).  Jordan requested an administrative hearing.  (Tr. 307-08).  ALJ Penny Loucas initially heard Jordan's case on April 13 and July 27, 2016; found that Jordan was able to perform his past work as a hand packager and grinder; and denied the claims in a September 13, 2016, decision. (Tr. 121-180, 242-269).  The Appeals Council determined that the record was not sufficiently developed to support the ALJ's decision and remanded the case to the ALJ with instructions to: (1) comply with the regulations and social security rulings; (2) obtain supplemental evidence from a vocational expert if the ALJ proceeded to Step Five; and (3) offer the claimant an opportunity for a new hearing.  (Tr. 272).  The ALJ conducted a new hearing on April 4, 2018 and denied Jordan's claims in a November 14, 2018 decision.  (Tr. 20-120).  Jordan again sought Appeals Council review and submitted new evidence from December 12 and 21, 2018. (Tr. 438-440; *see also* Tr. 8-14).  On September 17, 2019, the Appeals Council declined further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-7).  On October 15, 2019, Jordan filed a complaint to obtain judicial review.  ECF Doc. 1.

---

[1] The administrative transcript appears in ECF Doc. 9.

### III.    Evidence

#### A.    Personal, Educational, and Vocational Evidence

Jordan was born on January 11, 1971, and he was 42 years old on the alleged onset date. (Tr. 441).  Jordan was enrolled in special education classes when school-aged, and he completed the 11th grade.  (Tr. 511, 526).  Jordan had past work experience as a hand packager, dishwasher, kitchen helper, transport driver, punch press operator, stacker, inspector, and grinder.  (Tr. 167-70, 511, 526).  But he was not able to perform any of his past relevant work. (Tr. 37).

#### B.    Relevant Medical Evidence

On March 19, 2013, Jordan told Robert Jones, DO, that he had worsening back pain after having recently moved furniture.  (Tr. 642).  Jordan said that he originally injured his back while working at a steel factory when he was 18, but instead of seeking treatment for his back pain he had "just been dealing with the pain" since the injury.  (Tr. 642).  Jordan said that ibuprofen gave him "minimal relief," and he denied having any other medical problems.  (Tr. 642).  Physical examination showed that Jordan was atraumatic, had no edema or deep vein thrombosis, had no noted problems in his thoracic or lumbar spine, could move all four extremities, had 5/5 strength in his legs, had a normal gait, and had tenderness and prominence in his upper sacrum. (Tr. 642-43).  Dr. Jones determined that Jordan had chronic lumbar back pain with findings that suggested cauda equina radiculopathy.  (Tr. 643).

On June 19, 2013, Jordan told medical student Carwyn Sposit that he had chronic back pain, which he described as "sharp."  (Tr. 637).  Jordan said he also had some numbness and tingling in his low back, but no radiation.  (Tr. 637).  Jordan rated his pain as "greater than 10 out of 10."  (Tr. 637).  Jordan denied having any other joint or muscle pain.  (Tr. 637).  Sposit noted

3

that Jordan's back pain was worse with forward flexion, rotation, sitting, and standing.

(Tr. 637).  On examination, Jordan had a symmetric spine with no abnormal curvature.

(Tr. 637).  His range of motion was limited, and he had tenderness over his lumbar spine above

the sacrum.  (Tr. 637).  He also had a positive straight leg raise.  (Tr. 637).  Sposit referred

Jordan for a spine center consult and prescribed Ultram, Tylenol, and Neurontin.  (Tr. 637).

On July 23, 2013, Jordan told Emily Ferrall, CNP, that he'd had intermittent low back

pain since he was 18, that his pain was worse with movement, and that he got "moderate relief"

from Ultram, Tylenol, and Neurontin.  (Tr. 635).  Jordan denied having any numbness, tingling,

weakness, or paresthesias.  (Tr. 635).  On examination, Jordan had slight tenderness in his

sacral/lumbar area, negative straight leg raise, pain with range of motion, and an "appropriate"

gait.  (Tr. 636).  Ferrall continued Jordan's medications, added Naprosyn for pain, and

recommended that he do back exercises.  (Tr. 636).  Ferrall also noted that Jordan was morbidly

obese and recommended that he lose weight through diet and exercise.  (Tr. 636).

On July 29, 2013, Jordan saw Michael Harris, MD, for a physical medicine and

rehabilitation consultation.  (Tr. 631).  Dr. Harris noted that Jordan was morbidly obese and

originally injured his back after he bet his boss that he could lift 500 pounds when he was

18 years old.  (Tr. 631).  Dr. Harris noted that Jordan had increasing difficulty lifting, and that

his pain was worse with stooping, bending, and lifting.  (Tr. 631-32).  Jordan told Dr. Harris that

he took Motrin for his pain, and that Ultram did not work.  (Tr. 632).  On examination, Jordan

had tenderness in his lumbosacral junction, slight limitation of flexion, and normal extension and

bending.  (Tr. 632).  Dr. Harris directed Jordan to stop taking Motrin, prescribed Lodine, and

referred Jordan to physical therapy and weight management.  (Tr. 632).  Dr. Harris also ordered

x-rays of Jordan's spine, which showed moderate to marked narrowing in the L1-2, L4-5, and

4

L5-S1 spaces, moderate narrowing in the L2-3 space, and mild narrowing in the L3-4 space with degenerative spondylosis of the vertebral body end plates at the L1-2 and L5-S1 levels. (Tr. 632, 646). Jordan also had mild bilateral sacroiliitis, but his spinal alignment was normal, and he did not have spondylosis or spondylolisthesis. (Tr. 646). At a follow-up on October 1, 2013, Jordan told Dr. Harris that he had 10/10 pain in his lumbar spine, his pain was worse with prolonged sitting and ambulation, and Lodine had not helped. (Tr. 630). Jordan said that he had not started physical therapy or pain management, and Dr. Harris recommended that he start both. (Tr. 630-31). Dr. Harris also prescribed Mobic and said that he would consider a lumbar medial branch block if Jordan's pain persisted. (Tr. 631). On March 31, 2015, Dr. Harris ordered Jordan a lumbar transforaminal epidural steroid injection. (Tr. 700).

On October 1, 2013, Jordan saw Diana Ina, PT, for physical therapy. (Tr. 627). Jordan told Ina that he had increased pain with walking, sitting, cleaning the house, and standing to cook. (Tr. 627). Jordan also said that PT and massages had helped his back pain in the past after he was in a motor vehicle accident. (Tr. 627). Ina noted that, on examination, Jordan had significantly poor sitting/standing posture, reduced lumbar range of motion, limited flexibility, decreased strength in his right leg, and increased tenderness in his L4-5 and central sacrum area. (Tr. 628-29).

On December 19, 2013, Jordan told Elva Thompson, CNP, that he had chronic back pain since he had lifted 500 pounds as an 18-year-old. (Tr. 624). He had tried gabapentin and meloxicam without relief, but Motrin 800mg gave him "some relief." (Tr. 624). Jordan denied having any weakness, gait problems, or numbness. (Tr. 626). On examination, Jordan had diffuse paraspinal muscle tenderness, but he did not have any noted problems in his extremities

and his muscular strength was intact.  (Tr. 626).  Thompson diagnosed Jordan with chronic low back pain and recommended that he use Motrin *pro re nata*.  (Tr. 626).

On July 23, 2014, Jordan told Garett Helber, DO, that he had chronic low back pain that got worse with cutting grass, lifting, and bending over.  (Tr. 654).  Jordan said that lying down reduced his pain, and that his legs would "lock up" if he pushed himself.  (Tr. 654).  Jordan denied any joint swelling or myalgias.  (Tr. 655).  On examination, Jordan's spinal posture was within normal limits, his muscle bulk was normal, he had no pain on spinal palpation, he had normal muscle tone, he had an antalgic gait, he had limited range of motion on lumbar flexion, and he had full range of motion on lumbar extension.  (Tr. 656).  Dr. Helber diagnosed Jordan with low back pain, lumbar spondylosis, and lumbar facet arthropathy.  (Tr. 657).  Dr. Helber prescribed baclofen and ibuprofen and recommended that Jordan receive physical therapy. (Tr. 657).  Dr. Helber also noted that chiropractic manipulation or acupuncture might help if his medications and physical therapy did not.  (Tr. 657).

On July 25, 2014, Baldeep Gill, MA, noted that Jordan had middle lower back pain with radiation through both legs to his thighs, knees, and feet.  (Tr. 756).  Gill noted that Jordan had used NSAIDs and did not go to physical therapy.  (Tr. 756).

On April 28, 2015, Jordan told Dr. Harris that he did not notice a difference with an increased Topamax dose, and that he started having muscle spasms in his left lumbar area when he walked.  (Tr. 763).  Jordan said that he took Flexeril and Percocet, which made him sleepy, but also made him feel "a little better."  (Tr. 763).  Jordan also said that he had chronic numbness and tingling, and that he had broken his cane a week before his appointment.  (Tr. 763). Dr. Harris noted that a march 5, 2015, MRI showed degenerative disc disease, foraminal impingement, and multilevel facet arthropathy, but Jordan's lumbar alignment was normal.

(Tr. 764).  Jordan also had protrusion in his L4-5 space with moderate compression of the L5 nerve root, and he had protrusion in his L5-S1 space without nerve compression.  (Tr. 764).  Jordan had mild impingement on the caudal aspect of his neural foramina at the L4-5 and L5-S1 levels, but he did not have critical canal stenosis.  (Tr. 764).  On examination, Dr. Harris noted "marked tenderness" in Jordan's lumbosacral region and bilateral paraspinals, and his range of motion was "markedly decreased."  (Tr. 765).  Jordan had normal lower extremity sensation and strength.  (Tr. 765).  Dr. Harris refilled Jordan's Topamax, increased his Trazadone, recommended that he use Percocet "very sparingly," prescribed Mobic, and continued his Flexeril.  (Tr. 766).  Dr. Harris also recommended that Jordan continue with weight management and ordered him a new cane.  (Tr. 766, 769).

On April 29 and June 17, 2015, Kermit Fox, MD, gave Jordan epidural steroid injections.  (Tr. 695-96, 720-21).  Dr. Fox noted that Jordan tolerated the procedures well.  (Tr. 696, 721).

On May 20, 2015, NP student Nancy Ogar saw Jordan for weight management.  (Tr. 703).  Ogar noted that Jordan appeared motivated to make lifestyle changes to improve his energy level, improve his functioning, prepare for bariatric surgery, and prevent obesity-related comorbid conditions.  (Tr. 703).  On examination, Ogar noted that Jordan's back was symmetric, had normal curvature, had limited range of motion, and had tenderness to palpation.  (Tr. 708).  Jordan had trace lower extremity edema and bilateral knee crepitus.  (Tr. 708).  Ogar noted that weight loss would improve Jordan's conditions, including his lower back pain.  (Tr. 708).  Ogar also noted that Jordan's back pain was unrelieved by epidural steroid injections, but it was managed on Percocet, Voltaren, and Flexeril.  (Tr. 708).  Ogar recommended Jordan take on a 1500 calorie per day plan and exercise for 30 minutes every day.  (Tr. 708).

On May 31, 2015, Jordan saw Patricia Franta, CNP for weight management.  (Tr. 709).
Jordan said that he felt unable to exercise due to his low back pain, and that he did not do any
housework.  (Tr. 713).  On examination, Franta noted that Jordan's back was nontender to
palpation and he had no lower extremity edema.  (Tr. 713).  Franta noted that Jordan's low back
pain was managed with Percocet, Voltaren, and Flexeril.  (Tr. 714).  Franta also recommended a
1500 calorie diet and 30 minutes of exercise daily.  (Tr. 714).

On July 9, 2015, Dr. Harris noted that Jordan's low back pain radiated into his right
thigh, and that an epidural injection had not given him relief.  (Tr. 728).  Jordan said that his pain
was worse with sitting, standing, and lifting.  (Tr. 728).  On examination, Jordan had marked
tenderness in his lower lumbosacral region and paraspinals, markedly decreased range of motion,
guarded movement, and normal lower extremity sensation and strength.  (Tr. 730).  Dr. Harris
noted that he observed inconsistency in Jordan's spontaneous activity, and that his straight leg
raise improved when he was distracted.  (Tr. 730).  Dr. Harris continued Jordan's medications
and recommendation for weight management.  (Tr. 731).  At a follow-up on February 12, 2016,
Dr. Harris noted that Jordan had been "doing quite well" but aggravated his back again after
falling in his driveway a week earlier.  (Tr. 736).  Jordan said that his pain was gradually getting
better.  (Tr. 736).  Dr. Harris did not note any significant changes on examination, discontinued
his Voltaren prescription because it had caused dyspepsia, and continued Jordan's other
prescriptions.  (Tr. 738).  At a follow-up on July 28, 2016, Dr. Harris noted that nothing had
helped Jordan's pain, but he still accepted Percocet.  (Tr. 787).  Dr. Harris said that he was not
comfortable continuing to prescribe Percocet to Jordan and directed him to wean off of it.
(Tr. 787).

On November 5, 2015, Michael Viau, MD, noted that Jordan had tried various medications to help his back pain and that he had stopped physical therapy because it aggravated his back pain.  (Tr. 685).  Dr. Viau noted that Jordan continued to have back pain, had minimal benefit from his epidural injections, and weighed 322 pounds.  (Tr. 685).  On examination, Dr. Viau noted significant increased pain with lumbar flexion, marked restriction of flexion and extension, and paraspinal spasm.  (Tr. 686).  Dr. Viau prescribed Jordan Percocet to be taken three times daily and referred him for chronic pain management.  (Tr. 686).

On December 22, 2016, Jordan told Roger Goomber, MD, that he had constant low back pain that got worse with prolonged sitting, standing, and twisting.  (Tr. 794).  Jordan said that the pain shot down his right leg, causing burning and numbness.  (Tr. 794).  He reported trying various medications and that injections had not helped.  (Tr. 794).  On examination, Jordan had a grossly normal gait, no atrophy in his muscles, no abnormal movement in his neck, no asymmetry in his neck, 4/5 strength in his lower extremities, decreased hip flexion, no subluxation noted on movement of bilateral upper extremities or head/neck, and decreased sensation to sharp touch in his lower extremities.  (Tr. 796).  Dr. Goomber diagnosed Jordan with lumbar disc herniation, lumbosacral neuritis, and lumbosacral stenosis.  (Tr. 796).  Dr. Goomber prescribed gabapentin.  (Tr. 796).  On February 13, 2017, Jordan told Dr. Goomber that his pain was reduced and that he was able to sit longer while driving after starting gabapentin.  (Tr. 789). On February 21, 2017, Dr. Goomber gave Jordan an epidural steroid injection.  (Tr. 798-99).  On May 18, 2017, Jordan told Dr. Goomber that the steroid injection made his pain worse, and that he had leg cramping and lower back stiffness two days after the procedure.  (Tr. 879).  Jordan said that he got "30-40% relief" from gabapentin.  (Tr. 882).  Dr. Goomber did not note any significant changes on examination and increased Jordan's gabapentin prescription.

(Tr. 880-82).  At follow-ups on October 10 and December 6, 2017 Jordan told Dr. Goomber that he had fallen after twisting his ankle in September 2017, and that he had numbness in his legs. (Tr. 869, 874).  Dr. Goomber again noted no significant changes on examination and continued Jordan's gabapentin prescription.  (Tr. 870-72, 875-77).  Dr. Goomber also recommended Jordan perform physical therapy exercises to strengthen his core and reduce his pain.  (Tr. 872, 877).

On March 30, 2017, Jordan saw Richard Rhiew, MD, for a neurosurgical consultation. (Tr. 806).  Jordan told Dr. Rhiew that physical therapy, water therapy, and epidural steroid injections had not helped.  (Tr. 806).  Dr. Rhiew noted that he would check an x-ray for instability, CT scan for bony spondylosis, and MRI for nerve impingement to determine if Jordan was a good candidate for transfemoral lumbar interbody fusion surgery.  (Tr. 806).  On examination Jordan had normal gait, station, arm strength, leg strength, movement, and coordination.  (Tr. 807-08).  He had limited range of motion in his lumbar spine.  (Tr. 808). Dr. Rhiew noted that alternatives to surgery included over-the-counter drugs, prescription drug management, and physical/occupational therapy.  (Tr. 809).  Jordan also completed a self-report evaluation, indicating that walking, standing, and sitting made his pain worse.  (Tr. 810).  He reported generalized muscle weakness, joint pain, backache, limb pain, numbness, trouble walking, leg or back pain with walking, and limb weakness.  (Tr. 811).  Jordan rated his pain as an 8 out of 10, and said that it limited his ability to get out of bed, get dressed, lift more than very light weights, walk more than 0.25 miles, sit more than 10 minutes, stand for more than 10 minutes, and sleep for more than 4 hours.  (Tr. 813-15).  Raj Patel, MD noted that diagnostic imaging showed mild dextroscoliosis and moderate degenerative change in Jordan's spine. (Tr. 819).  At a follow-up on May 16, 2017, Dr. Rhiew noted that a CT had shown scoliosis, spondylolisthesis, and severe foraminal stenosis at multiple levels.  (Tr. 801).  Dr. Rhiew

continued his recommendation for surgery and indicated that he would attempt another MRI, which providers had been unable to get due to Jordan's body habitus. (Tr. 801). On January 17, 2018, Dr. Rhiew noted that Jordan had progressive leg numbness to his feet, which caused him to fall down steps, and that he believed a fusion surgery would help Jordan's condition from becoming worse and preserve his neurological function. (Tr. 885).

On May 4, 2017, radiologist Elaine Jennifer Sommer, DO, interpreted a CT scan of Jordan's spine and determined that he had multilevel degenerative changes, including dextroconvex curvature, diffuse disc bulging and endplate spurring, and degenerative facet changes, at every level. (Tr. 816-18).

### C. Relevant Opinion Evidence

#### 1. Treating Physician Opinion – Michael Harris, MD

On July 6, 2016, Dr. Harris completed a "treating source statement – physical conditions." (Tr. 777-80, 772-74 (partial duplicate)). Dr. Harris indicated that Jordan could lift and carry 10 pounds or more occasionally, 20 pounds rarely, and never 50 pounds or more. (Tr. 778). He could sit for up to 6 hours in a workday and stand/walk for up to 4 hours each. (Tr. 778). He would require a sit/stand at will option, and he needed a cane to walk. (Tr. 778-79). Jordan could frequently reach in all directions and overhead bilaterally, occasionally handle with is right arm, continuously handle with his left arm, continuously finger and feel bilaterally, and rarely push/pull. (Tr. 779). Jordan could frequently use foot controls and rarely climb stars, ramps, ladders, and scaffolds. (Tr. 779). He could rarely balance, stoop, kneel, crouch, crawl, and rotate his head/neck. (Tr. 779-80). Jordan could rarely work at unprotected heights, and could occasionally be exposed to moving mechanical parts, operating a

vehicle, humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, extreme heat, and vibrations.  (Tr. 780).

### 2.      Treating Physician Opinion – Richard Rhiew, MD

On January 18, 2018, Dr. Rhiew completed a "medical source statement: patient's physical capacity" form.  (Tr. 821-22).  Dr. Rhiew said that Jordan could lift or carry up to 5 pounds occasionally, stand/walk for a total of 3 hours in an 8-hour workday, and sit for up to 5 hours in an 8-hour workday and 2 hours without interruption.  (Tr. 821).  He could never climb, balance, stoop, crouch, kneel, and crawl.  (Tr. 821).  He could rarely reach, push, pull, and manipulate (fine or gross).  (Tr. 822).  He could not be around heights, moving machinery, or temperature extremes.  (Tr. 822).  He had severe pain and would need to be able to alternate positions at will.  (Tr. 822).  He would need to be able to elevate his legs to 90 degrees at will. (Tr. 822).  He would also have issues with concentration, off-task behavior, and absenteeism, including a need for breaks outside of the regularly scheduled breaks.  (Tr. 822).  Dr. Rhiew indicated that Jordan would need to rest for at least 8 hours per day.  (Tr. 822).

### 3.      Consultative Examiner – Khem Khooblall, MD

On March 7, 2016, Khem Khooblall, MD, conducted a consultative examination to assess Jordan's physical abilities.  (Tr. 675-80).  Dr. Khooblall noted that he did not perform any testing.  (Tr. 675).  Dr. Khooblall noted that Jordan had a history of back pain, which was treated with Vicodin, Percocet, and Neurontin.  (Tr. 676).  Dr. Khooblall noted that Jordan was in severe pain all day long and could not stand, walk or sit for long periods.  (Tr. 676).  He also noted that Jordan was advised to lose weight.  (Tr. 676).  On examination, Dr. Khooblall indicated that Jordan had tenderness in his lumbar spine and a wide-based gait with a cane.  (Tr. 677).  Jordan had normal reflexes.  (Tr. 677).  Jordan had decreased back and hip flexion and extension and

decreased lateral bending, but his movement was otherwise within the normal range. (Tr. 678). Dr. Khooblall indicated that Jordan had normal strength in his right arm, but "no contraction or muscle movement" in his left shoulder. (Tr. 679).

Dr. Khooblall opined that Jordan was "extremely limited" in walking. (Tr. 679). Dr. Khooblall also stated that Jordan had "moderate limitations" in standing, pushing, pulling, bending, reaching, and repetitive foot movements. (Tr. 679). He had no limitation in sitting and fine motor movements. (Tr. 679). Dr. Khooblall also stated that Jordan could lift no more than 10 pounds at a time and occasionally lift or carry articles like docket files and small tools. (Tr. 680). Dr. Khooblall explained these limitations by stating that Jordan was "unstable on legs, walks with a wide base and with a tilt to the right. Hip and knee of left leg limited in range of motion." (Tr. 679). Dr. Khooblall did not, however, provide an explanation for the pushing, pulling, and reaching limitations. (Tr. 679).

### 4.   State Agency Consultants

On August 19, 2014, state agency consultant William Bolz, MD, evaluated Jordan's physical capacity based on a review of the medical record. (Tr. 216-18). Dr. Bolz determined that Jordan could lift up to 20 pounds occasionally and 10 pounds frequently, stand and/or walk for up to 6 hours in an 8-hour day, and sit for up to 6 hours in an 8-hour workday. (Tr. 216). Dr. Bolz also said that Jordan was limited in pushing and/or pulling in his right lower extremity. (Tr. 216). Jordan could occasionally climb ramps/stairs, crouch, crawl, and kneel; frequently stoop; never climb ladders/ropes/scaffolds; and balance without limitation. (Tr. 217). Jordan did not have any manipulative limitations, and he was to avoid all exposure to hazards such as machinery and lights. (Tr. 217). On December 17, 2014, Diane Manos, MD, concurred with Dr. Bolz's opinion. (Tr. 188-90).

### D.      Relevant Testimonial Evidence

Jordan testified at the November 2018 ALJ hearing.  (Tr. 67- 79).  Jordan testified that his condition had become worse since he was last before the ALJ, and that he could no longer bend over to tie his shoes.  (Tr. 71).  Jordan said that his girlfriend helped him wash his back and legs and put his socks on.  (Tr. 71).  Jordan said that he kept all of his items, such as dishes, on lower shelve so he would not need to stretch to reach them.  (Tr. 71).  Jordan said that his left shoulder did not allow him to reach overhead.  (Tr. 72).  He also could not reach with his left shoulder to vacuum.  (Tr. 72).  Jordan said that he could only stand or sit for five minutes, and that he spent most of the day lying on the couch.  (Tr. 79).  Jordan said that if he changed positions too often the nerves in his legs got "real bad and [his] legs g[a]ve out."  (Tr. 79).  If he sat for too long, he felt a sharp pain in his lower spine.  (Tr. 79).  Jordan said that his shoulder started getting worse in 2010, but his doctor didn't look at it and said he would worry about the shoulder after his back surgery.  (Tr. 72).

Jordan also testified that that steroid injections had been his primary treatment for his pain since 2011, but they didn't work.  (Tr. 73).  Jordan said that he also had tried physical therapy, but his doctor stopped it after realizing he wasn't able to do physical therapy.  (Tr. 75). Jordan also said that his pain medications (Vicodin and Percocet) had not helped, and he stopped taking them.  (Tr. 76).  He said anti-inflammatories had also not helped.  (Tr. 76).  Jordan said that he took gabapentin three times a day for his pain.  (Tr. 76).

Gail Kleir, a vocational expert ("VE"), also testified at the ALJ hearing.  (Tr. 64-65, 89-119).  The VE said that Jordan had past work as a hand packager, punch press operator, stacker, inspector, transport driver, grinder, and dishwasher/kitchen helper.  (Tr. 64-65).  The

ALJ asked the VE whether a hypothetical individual with Jordan's age, experience, and education could work if he:

> can engage in light exertion, frequent foot controls with the right foot, never climb any ladders, ropes, or scaffolds, occasionally climb ramps and stairs, unlimited balancing, frequently stoop, occasionally kneel, crouch, and crawl.  No commercial driving, no operating heavy machinery such as power saws or jackhammers, and working on unprotected heights, is limited to simple, routine type work with few changes, low production demands . . . not required to perform work that requires strict production demands for time or quantity, limited – and goal oriented work is acceptable.  . . . Limited to superficial interaction with the general public, coworkers, and supervisors, defined as speaking, signaling, and serving, but not directing the work of others or resolving conflicts or mentoring.

(Tr. 89).  The VE testified that such an individual could not perform any of Jordan's past work, but could work as a price marker, unskilled cleaner/ housekeeper, or laundry aide.  (Tr. 90-91).

The ALJ asked if a hypothetical could work if he were limited to:

> light exertion, frequent foot controls frequent foot controls with the right foot, never climb any ladders, ropes, or scaffolds, occasionally climb ramps and stairs, unlimited balancing, frequently stoop, occasionally kneel, crouch, and crawl, no commercial driving, operating heavy machinery such as power saws or jackhammers, and working on unprotected heights.  As for mental, limited to simple, routine type work with few changes . . . Low production demands limited to superficial interaction with general public, coworkers, and supervisors to perform superficial type functions such as asking questions, following instructions, swerving, but no directing the work of others or resolving conflicts or mentoring.

(Tr. 91-92).  The VE said that such an individual could still work as a price marker, cleaner/housekeeper, and laundry aide.  (Tr. 95).  If the individual described in the second hypothetical had to stand or walk every 30 minutes, the VE testified that the individual could still work as price marker, cleaner/housekeeper, or laundry aide.  (Tr. 95-96).  If the individual described in the second hypothetical had to be able change position every 30 minutes between sitting, walking, and standing (fourth hypothetical), he could still work as a price marker or order caller, but could not work as a cleaner/housekeeper or laundry aide.  (Tr. 96-98).

15

The ALJ asked if the individual described in the fourth hypothetical could work if he were limited to sedentary exertion.  (Tr. 98).  The VE testified that such an individual could work as a document preparer or an addresser.  (Tr. 98).  If the sit/stand option were removed, the individual cold work as a document preparer, addresser, lense inserter, food and beverage clerk, and other jobs.  (Tr. 100-01).

The ALJ asked the VE if all of the individuals described in each of the above hypotheticals could work if the individuals were required to use a cane for ambulating distances greater than 25 feet and on uneven surfaces.  (Tr. 101-02).  The VE said that none of the light exertion jobs could be performed, but all the sedentary jobs could still be performed. (Tr. 102-03).  The ALJ asked the VE if all of the individuals described in each of the hypotheticals could work if additionally limited to no overhead reaching with the non-dominant hand and no reaching backward.  (Tr. 107, 112).  The VE said that all light jobs would be eliminated, because each would require occasional overhead reaching.  (Tr. 113-14).  But none of the sedentary jobs would be affected.  (Tr. 114).  The VE said that, with regard to any of the above hypotheticals, work would not be available if the individual were off task for more than 10% of the workday or absent for two days per month.  (Tr. 114-15).

Jordan's attorney asked the VE whether an individual could work if he were not able to lift up to 10 pounds even occasionally.  (Tr. 115).  The VE said no work would be available. (Tr. 115).  Jordan's attorney asked if work could be performed by an individual who could not walk as part of the required job duties and was limited to occasional standing (1/3 of the workday).  (Tr. 115-16).  The VE said that no jobs would be available.  (Tr. 116-17).  Jordan's attorney asked if an individual limited to sedentary work could perform any jobs if they were

limited to occasional pushing and pulling with the left upper extremity.  (Tr. 118).  The VE said

that all the jobs identified at the sedentary level would still be available.  (Tr. 118).

## IV.     The ALJ's Decision

The ALJ denied Jordan's claims for DIB and SSI in a November 14, 2018, decision.

(Tr. 23-40).  The ALJ determined that Jordan had the severe impairments of: "left shoulder

arthritis changes in the spine with no evidence of myelopathy or weakness; deconditioning and

degenerative disc disease of the lumbar spine; obesity; and borderline intellectual functioning."

(Tr. 26).  But none of Jordan's impairments, singly or in combination, met the severity criteria

for a categorically disabling impairment under the Listings of Impairments.  (Tr. 27-29).  The

ALJ determined that, from the alleged onset date through March 5, 2015, Jordan had the RFC to

perform a reduced range of light work, except that:

> the claimant could occasionally lift and carry up to 20 pounds and frequently lift
> and carry up to 10 pounds.  He could sit for six hours total in an eight-hour
> workday and stand and/or walk for six hours total in an eight-hour workday.
> Moreover, the claimant could frequently use foot controls with the right foot.  He
> could never climb any ladders, ropes, or scaffolds.  Further, the claimant could
> occasionally climb ramps and stairs.  He could unlimitedly balance.  Additionally,
> the claimant could frequently stoop.  He could occasionally kneel, crouch, and
> crawl.  Moreover, the claimant could not perform any commercial driving, could
> not operate heavy machinery such as power saws or jack hammers, and could not
> work at unprotected heights.  He was limited to simple routine type work with
> few changes.  Furthermore, the claimant could perform low production demands,
> defined as not being required to perform work that requires strict production
> demands for time or quantity. He could perform goal-oriented work.  Finally, the
> claimant was limited to superficial interaction with the general public, co-
> workers, and supervisors, defined as speaking, signaling, and serving, but no
> directing the work of others or resolving conflicts or mentoring.

(Tr. 29).  The ALJ further determined that from March 6, 2015, through November 14, 2018,

Jordan had the RFC to perform a reduced range of sedentary work, except that:

> the claimant can occasionally lift and carry 10 pounds and frequently lift and
> carry less than 10 pounds.  He can sit for six hours total in an eight-hour workday
> and stand and/or walk for two hours total in an eight-hour workday with changing

positions from standing, walking, or sitting every 30 minutes.  Moreover, the claimant can frequently use foot controls with the right foot.  He can never climb any ladders, ropes, or scaffolds.  Further, the claimant can occasionally climb ramps and stairs.  He can unlimitedly balance.  Additionally, the claimant can frequently stoop.  He can occasionally kneel, crouch, and crawl.  Moreover, the claimant cannot perform any commercial driving, cannot operate heavy machinery such as power saws or jack hammers, and cannot work at unprotected heights.  He is limited to simple routine type work with few changes.  Furthermore, the claimant can perform low production demands, defined as not being required to perform work that requires strict production demands for time or quantity.  He can perform goal-oriented work.  Finally, the claimant is limited to superficial interaction with the general public, co-workers, and supervisors, defined as speaking, signaling, and serving, but no directing the work of others or resolving conflicts or mentoring.

(Tr. 29).

In assessing Jordan's RFC, the ALJ explicitly stated that she "considered all symptoms" in light of the medical and other evidence.  (Tr. 29).  The ALJ stated that, after reviewing Jordan's subjective complaints in light of the factors set in 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3), she found that his "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record."  (Tr. 30).  The ALJ specifically considered Jordan's subjective complaints that he had limitations in, among other things, lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, overhead reaching, and reaching to tie his shoes.  (Tr. 30-31).  But she concluded that Jordan's subjective complaints were inconsistent with his function report, indicating that he:

he drives a car, pays bills, counts change, plays video games, spends time with others, goes on walks, goes outside almost every day, does not need to be reminded to go places, does not need any help or reminders to take his medicine, does not need any special reminders to take care of his personal needs and grooming, and goes to his Mother's house, his neighbor's house, and his children's Mother's house on a regular basis.

(Tr. 31).

The ALJ also determined that Jordan's subjective complaints were inconsistent with the medical evidence in the record.  (Tr. 31).  In assessing Jordan's condition from the alleged onset date through March 5, 2015, the ALJ noted that medical records had shown that Jordan had intact muscular strength, had no edema or discoloration of the extremities, denied joint swelling or myalgias, had limited flexion range of motion in his lumbar spine, had full extension range of motion in his lumbar spine, had normal muscle tone and symmetrical bulk in his upper and lower extremities, and had normal spinal curves.  (Tr. 31-32).  In assessing Jordan's condition after March 5, 2015, the ALJ noted that medical records showed diminished (but unquantified) range of motion in his lumbosacral region, normal range of motion in the cervical spine, good strength and sensation in his lower extremities, good strength overall, and a normal gait.  (Tr. 34-36). The ALJ specifically noted that Dr. Khooblall had found Jordan had a frozen left shoulder on examination in March 2016, but that other records showed symmetric arms with no atrophy or abnormal movements in March 2017 and no subluxation on movement of the bilateral upper extremities in May 2017.  (Tr. 35-36).  The ALJ also noted that Jordan was given a list of physical therapy exercises to perform to strengthen his core, maintain stabilization, and reduce his pain.  (Tr. 36).

In weighing the medical opinion evidence, the ALJ stated that she gave "partial weight" to Dr. Rhiew's opinion.  (Tr. 36).  The ALJ explained that:

> Although Dr. Rhiew opined the claimant is capable of performing less than the full range of sedentary exertional work, which is consistent with the medical records and limitations noted in the record, only partial weight is given to his opinion because he failed to provide any support, such as references to particular physical examination findings or treatment notes, for his check marks and circles on the form.

(Tr. 36).  The ALJ also said that she gave "little weight" to Dr. Khooblall's opinions because "he used vague, imprecise terms and did not attempt to quantify or define the limits.  Hence, his

19

opinion offers little insight into the claimant's residual functional capacity."  (Tr. 37).  Further, the ALJ gave "partial weight" to Dr. Bolz's and Dr. Manos's opinions and "little weight" to Dr. Harris's opinion.  (Tr. 34, 36).

Because the ALJ determined that Jordan could perform less than the full range of work at any exertional level, the ALJ relied on VE testimony to determine whether Jordan could perform any work in the national economy during the relevant period.  (Tr. 38-40).  Based on the VE's testimony, the ALJ determined that Jordan could "perform the requirements of representative occupations such as: (1) price marker, cleaner/housekeeper, or laundry aide from the alleged onset date through March 5, 2015; and (2) document preparer, addresser, lens inserter, or food and beverage order clerk from March 6, 2015, through November 14, 2018.  (Tr. 39).  Based on her findings, the ALJ concluded that Jordan was not disabled from the alleged onset date of August 15, 2013, through the date of her decision (November 14, 2018), and denied Jordan's claims for DIB and SSI.  (Tr. 40).

## V.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as

substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, No. 19-2441, 2020 U.S. App. LEXIS 25007, at *15, ___ F. App'x ___ (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones*, 336 F.3d at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783 ("It is not our role to try the case de novo." (quotation omitted)). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio

Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn.

July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D.

Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a

reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine

whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial

gainful activity; (2) if not, whether the claimant has a severe impairment or combination of

impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals

any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant

can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the

claimant's age, education, and work experience, he can perform other work found in the national

economy.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc.

Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to

produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient

evidence to prove that he is disabled and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a),

416.912(a).

### B.    Sentence Six – New and Material Evidence[2]

Jordan argues that the court should remand his case pursuant to Sentence Six of 42

U.S.C. § 405(g), because new and material evidence could change the outcome of his case.  ECF

Doc. 14-1 at 24-26.  Specifically, Jordan asserts that, after the ALJ issued her November 2018

decision, a December 2018 MRI showed that he had significant deficits in his left shoulder that

---

[2] Although Jordan's request for a Sentence-Six remand is the last issue presented in his merits brief, the court addresses this issue first because, if such a remand were granted, the court would not be permitted to affirm, modify, or reverse the Commissioner's decision.  *See Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991).

could change the ALJ's RFC finding and assessment of Jordan's statements regarding his limitations.  ECF Doc. 14-1 at 25-26.  Jordan also contends that this evidence is new because "it was clearly not in existence at the time of the hearing or available at the time of the ALJ's decision."  ECF Doc. 14-1 at 25.

The Commissioner responds that Jordan's evidence is not "new" because it involved an MRI and examination after the ALJ's decision, and that it is not material because it reflected only Jordan's condition after the ALJ's decision.  ECF Doc. 16 at 16-17.  Thus, the Commissioner argues that "the Appeals Council properly found that the later submitted evidence did not relate to the period at issue."  ECF Doc. 16 at 17.

A court may remand a case for the Commissioner to consider newly discovered evidence pursuant to Sentence Six of 42 U.S.C. § 405(g).  To obtain such a remand, the claimant must show that: (1) the evidence is new; (2) the evidence is material; and (3) good cause excuses the claimant's failure to incorporate the evidence into a prior administrative proceeding.  42 U.S.C. § 405(g); *Casey v. Sec'y of Health & Hum. Serv.*, 987 F.2d 1230, 1233 (6th Cir. 1993).  "New evidence" is evidence that did not exist or was not available to the claimant at the time of the administrative proceeding.  *Finkelstein v. Sullivan*, 496 U.S. 617, 626 (1990).  To be material, the evidence must be: (1) chronologically relevant, *i.e.* reflect upon the claimant's condition during the relevant period; and (2) probative, *i.e.*, have a reasonable probability that it would change the administrative result.  *See Casey*, 987 F.2d at 1233 (holding that a claimant's new evidence was not material because it did not show a "marked departure from previous examinations" and it "pertain[ed] to a time outside the scope of our inquiry"); *accord Winslow v Comm'r of Soc. Sec.*, 556 F. App'x 418, 422 (6th Cir. 2014).  And the Sixth Circuit takes a "harder line" approach to good cause – a claimant cannot simply point to the fact that the

evidence was not created until after the ALJ hearing, but must establish good cause for why he did not cause the evidence to be created and produced until after the administrative proceeding. *See Perkins v. Apfel*, 14 F. App'x 593, 598-99 (6th Cir. 2001). Moreover, when the evidence was available before the Appeals Council declined review, the claimant must explain why he did not submit that evidence to the Appeals Council. *Cf. Lee v Comm'r of Soc. Sec.*, 529 F. App'x 706, 717 (6th Cir. 2013) (finding that a claimant did not show good cause when, *inter alia*, the claimant did not submit April 2011 evidence when the Appeals Council received additional evidence in August 2011).

As a preliminary matter, it is important to note that the "new evidence" for which Jordan now seeks a remand is *not* the same new evidence that the Appeals Council reviewed and determined did not warrant remand. *Compare* ECF Doc. 14-2 (the "new evidence" before this court), *with* (Tr. 8-14) (the new evidence before the Appeals Council). Both involve radiological imaging and interpretation from December 21, 2018. *Compare* ECF Doc. 14-2, *with* (Tr. 12-14). But the imaging and interpretation before the Appeals Council focused on Jordan's spine, whereas the imaging and interpretation before this court focuses on Jordan's shoulder. *Compare* ECF Doc. 14-2, *with* (Tr. 12-14). Moreover, Jordan's argument does not in any way challenge the Appeals Council's determination that the "new evidence" presented to it was chronologically irrelevant. *See* ECF Doc. 14-1 at 24-26. Thus, the Commissioner's argument that the Appeals Council properly found the evidence chronologically irrelevant is misplaced.

Still, Jordan has not met his burden to show that a Sentence Six remand is appropriate. The court agrees with Jordan that his evidence is new – one cannot reasonably dispute that a December 2018 MRI and interpretation was not available when the ALJ issued her November 2018 decision. *Finkelstein*, 496 U.S. at 626. But the evidence is not chronologically relevant

and is, therefore, not material.  *Casey*, 987 F.2d at 1233.  On its face, the Jordan's new MRI and interpretation reflects only upon the condition of Jordan's shoulder on December 21, 2018 and does comment on his condition during the relevant period – August 15, 2013 through November 14, 2018.  (Tr. 40, 456, 458).  Further, despite noting that the MRI and interpretation did not exist at the time of the ALJ's decision, Jordon has failed to show good cause because he has not offered any explanation why he did not submit the MRI and interpretation to the Appeals Council when it received other new evidence including another MRI and interpretation from December 21, 2018.  *Lee*, 529 F. App'x at 717; ECF Doc. 14-1 at 24-26; (Tr. 2, 12-14).  Because Jordan has not satisfied the materiality or good cause elements, he has not met his burden to show that a Sentence Six remand is appropriate in this case.  *Casey*, 987 F.2d at 1233; 42 U.S.C. § 405(g).

Accordingly, Jordan's request to remand this case to the Commissioner for consideration of his new evidence must be denied.

### C.    Weight of Dr. Rhiew's Opinion

Jordan argues that the ALJ did not provide "good reasons" for giving Dr. Rhiew's opinion only "partial weight."  ECF Doc. 14-1 at 17-20.  Specifically, Jordan asserts that the ALJ did not provide an adequate explanation why Dr. Rhiew's opinion was not due controlling weight when the ALJ: (1) determined that Dr. Rhiew's opinion that he was incapable of performing the full range of sedentary work was *consistent* with the medical records; and (2) omitted from her discussion consideration of the May 4, 2017 spinal CT and interpretation.  ECF Doc. 14-1 at 19-20.  Further, Jordan contends that the ALJ did not adequately address the regulatory factors or explain clearly how she applied the "partial weight" afforded to Dr. Rhiew's opinion in assessing his RFC.  ECF Doc. 14-1 at 20.

The Commissioner responds that the ALJ *did* consider the findings of the May 4, 2017 CT scan.  ECF Doc. 16 at 13.  The Commissioner also argues that the ALJ adequately explained that Dr. Rhiew's opinion, though partially consistent with the ALJ's finding that Jordan was not able to perform the full range of sedentary work, was not supported with details or references to examination notes but was "effectively . . . an unexplained checkbox form."  ECF Doc. 16 at 13.

At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives.  20 C.F.R. §§ 404.1527(c), 416.927(c).  An ALJ must give a treating source opinion controlling weight, unless the opinion is: (1) not "supported by medically acceptable clinical and laboratory diagnostic techniques"; or (2) inconsistent with finding in the treating source's own records or other medical evidence in the case record.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 786 (6th Cir. 2017).  And, if the ALJ finds either prong justifies giving the treating source opinion less-than-controlling weight, she must articulate "good reasons" for doing so – *i.e.*, explain which prong justifies that decision.  *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); *Biestek*, 880 F.3d at 786.

If an ALJ determines that the treating physician's opinion is not due controlling weight, the ALJ must proceed to weigh the opinion based on: the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, whether the treating physician is a specialist, the physician's understanding of the disability program and its evidentiary requirements, the physician's familiarity with other information in the record, and other factors that might be brought to the ALJ's attention.  *See Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).  Nothing in the regulations requires the ALJ to explain how she considered each of the factors.  *See* 20 C.F.R. §§ 404.1527(c), 416.927(c);

*Biestek*, 880 F.3d at 786 ("The ALJ need not perform an exhaustive, step-by-step analysis of each factor.").  However, the ALJ must at least provide good reasons for the ultimate weight assigned to the opinion.  *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) (acknowledging that, to safeguard a claimant's procedural rights and permit meaningful review, 20 C.F.R. § 404.1527(d)(2) (and § 416.927(d)(2)) require the ALJ to articulate good reasons for the ultimate weight given to a medical opinion).  When the ALJ fails to adequately explain the weight given to a treating physician's opinion, or otherwise fails to provide good reasons for the weight given to a treating physician's opinion, remand is appropriate.  *Cole*, 661 F.3d at 939; *see also Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (holding that the failure to identify good reasons affecting the weight given to an opinion "'denotes a lack of substantial evidence, even whe[n] the conclusion of the ALJ may be justified based upon the record.'" (citing *Rogers*, 486 F.3d at 243)).

      As a preliminary matter, this court assumes – without deciding – that Dr. Rhiew was, in fact, a treating physician.  The ALJ made no finding on this issue.  *See generally* (Tr. 23-40).  Jordan's brief assumes that Dr. Rhiew was a treating physician.  ECF Doc. 14-1 at 17-20.  And the Commissioner's brief makes no argument otherwise.  *See generally* ECF Doc. 16.  Moreover, evidence in the record could support a finding that Dr. Rhiew was a treating physician – he examined Jordan multiple times from March 2017 through 2018, ordered diagnostic imaging, evaluated whether he was suitable for surgery, and ultimately recommended that he schedule surgical treatment.  (Tr. 801-15, 885).  But the Sixth Circuit has also held that, depending on the circumstances, an ALJ could determine that even a physician who has seen a claimant three times is not a treating physician.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506 (6th Cir. 2006); *accord Boucher v. Apfel*, 238 F.3d 419, 2000 U.S. App. LEIS 29895, at *23-24

(6th Cir. 2000).  Thus, while the ALJ might have properly reached a conclusion on the nature of Dr. Rhiew's relationship to Jordan, the ALJ's failure to make any finding on this issue precludes meaningful review of whether Dr. Rhiew was or was not a treating physician.  *Cf. Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (stating that the reason-giving requirement is, in part, intended to permit meaningful review of the ALJ's decision).

Assuming that Dr. Rhiew was a treating physician, the ALJ failed to apply proper legal standards in evaluating his opinion.  Here, the ALJ failed to apply the correct standard in evaluating whether Dr. Rhiew's opinion was due controlling weight under 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), but instead applied only the standard for evaluating a non-controlling opinion under 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).  (Tr. 36).  The important difference between the two steps is that: (1) the controlling-weight analysis requires an ALJ to look to whether the treating source opinion is "supported by supported by medically acceptable clinical and laboratory diagnostic techniques"; whereas (2) the non-controlling-weight analysis permits an ALJ to discount a non-controlling opinion if, *inter alia*, the source failed to provide sufficient explanation for or evidence backing the opinion.  *Compare* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (Sentence Two), *with* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).  The two analyses are different.  *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (stating that the ALJ should proceed to consider whether the factors, such as supportability under paragraph (c)(3), only *after* having concluded that the opinion is not due controlling weight).  Nevertheless, an ALJ might for the sake of brevity combine her controlling-weight and non-controlling-weight analyses when, for example, inconsistency with other evidence justifies both declining to give the opinion controlling weight and giving it a discounted weight in light of the regulatory factors.  *Compare* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (consistency in the

28

controlling-weight standard), *with* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) (consistency as a regulatory factor for non-controlling opinions).

Unfortunately, the ALJ's evaluation of Dr. Rhiew's opinion was not the kind that could be so condensed.  Because the ALJ found that Dr. Rhiew's opinion was *consistent* with the medical evidence, she was required to give that opinion controlling weight unless she found that Dr. Rhiew's opinion was not "supported by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); (Tr. 36).  The ALJ made no such finding.  (Tr. 36).  Instead, the ALJ proceeded directly to the non-controlling-weight analysis and said that the ALJ did not provide sufficient references/explanation. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3); (Tr. 36).  But "the fact that a [treating] physician left her opinion unexplained on a form does not mean that it is not 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and thus not entitled to controlling weight.'"[3] *See Collins v. Berryhill*, No. 17-cv-467, 2019 U.S. Dist. LEXIS 89298, at *12 (W.D.N.Y. May 28, 2019).  Therefore, the ALJ's failure to explain that she found Dr. Rhiew's opinion was not "supported by medically acceptable clinical and laboratory diagnostic techniques" – after expressly stating that it was consistent with the medical evidence – resulted in a failure to give "good reasons" for declining to give the opinion controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Biestek*, 880 F.3d at 786; *Gayheart*, 710 F.3d at 736.

---

[3] In *Kepke v. Comm'r of Soc. Sec.*, the Sixth Circuit affirmed an ALJ's decision to discount a treating source's conclusory form opinion and stated that "it is not improper for an ALJ to take into consideration the form of a medical opinion." 636 F. App'x 625, 631 (6th Cir. 2016).  But the Sixth Circuit made this ruling in the context of the regulatory factors analysis for a non-controlling opinion after having already determined that the treating source's over-reliance on the claimant's self-reporting – rather than medically acceptable diagnostic techniques – supported the ALJ's decision to not give the opinion controlling weight. *Id.* at 630.

And that decision certainly cannot be said to have built an accurate and logical bridge between the evidence and the result.  *Fleischer*, 774 F. Supp. 2d at 877.

The ALJ's failure to apply proper legal standards in weighing Dr. Rhiew's opinion is harmless with regard to the RFC period from August 15, 2013 through March 5, 2015.  *Bowen*, 478 F.3d at 746 ; *Rabbers*, 582 F.3d at 654.  Dr. Rhiew's relationship with Jordan began in March 2017 – over two years after the August 2013 to March 2015 RFC period.  (Tr. 806).  Moreover, Dr. Rhiew's 2018 opinion was an assessment of Jordan's abilities *at that time* and did not comment upon Jordan's abilities before March 5, 2015.  (Tr. 821-22).  Thus, because Dr. Rhiew's opinion had no relationship to the April 2013 to March 2015 RFC period, Jordan cannot show that he was prejudiced by any failure to incorporate limitations from Dr. Rhiew's opinion into the RFC for that period.  *See Rabbers*, 582 F.3d at 654 (stating that an error is harmless unless the claimant was prejudiced on the merits or deprived of substantial rights).

But this court cannot conclude that the ALJ's failure to apply proper legal standards in weighing Dr. Rhiew's opinion was harmless with regard to the March 6, 2015 through November 14, 2018 RFC period.  *Bowen*, 478 F.3d at 746 ; *Rabbers*, 582 F.3d at 654.  A review of Dr. Rhiew's notes reveals that Dr. Rhiew employed a dynamic set of diagnostic techniques – including physical examinations, x-rays, MRIs, and CT scans.  (Tr. 801, 806-08, 819).  It is hard to see how one could conclude that such techniques are not "medically acceptable clinical . . . diagnostic techniques."[4] 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  And, although a finding that Dr. Rhiew was not a treating physician could have allowed the ALJ to skip any controlling-weight analysis, the ALJ did not make such a finding and evidence in the record could support a

---

[4] This result would, for example, be different had Dr. Rhiew relied exclusively on Jordan's self-reports (*see*, *e.g.*, Tr. 810-15) in diagnosing and treating Jordan.  *See Kepke*, 636 F. App'x at 630 ("[A] doctor cannot simply report what his patient says and re-package it as an opinion.").

finding that Dr. Rhiew was, in fact, a treating physician.  (Tr. 36, 801-15, 885) (multiple examinations in which Dr. Rhiew evaluated Jordan for surgery and made treatment recommendations, including scheduling a surgery to be performed by Dr. Rhiew).  Thus, because the ALJ determined that Dr. Rhiew's opinion was *consistent* with the medical record, Dr. Rhiew's opinion was due controlling weight if he was, in fact, a treating physician.  .  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Biestek*, 880 F.3d at 786.  Moreover, it is not clear that the ALJ would have still concluded that Jordan was not disabled had she incorporated into the RFC for the period beginning March 6, 2015 (or the RFC for a third, later period) all of the limitations included in Dr. Rhiew's opinion.  Because – as the ALJ correctly states – Dr. Rhiew's opinion would have established that Jordan was not capable of even sedentary level exertion, none of the sedentary or light jobs identified by the ALJ would have been available had all of the limitations in Dr. Rhiew's opinion been incorporated into Jordan's RFC.  (Tr. 29, 36, 39, 821-22).

Because the ALJ's failure to apply proper legal standards in weighing Dr. Rhiew's opinion was harmless with regard to the August 2013 through March 2015 RFC period, the court will not disturb the ALJ's decision to give Dr. Rhiew's opinion "partial weight" as it relates to that RFC period.  On the other hand, because the ALJ failed to apply proper legal standards in weighing Dr. Rhiew's opinion, and that failure was not harmless error with regard to the March 2015 through November 2018 RFC period, the ALJ's decision must be vacated and remanded for further consideration.  On remand, the ALJ should – at the very least – make a finding as to whether Dr. Rhiew was or was not a treating physician.

### D.      Weight of Dr. Khooblall's Opinion

Jordan argues that the ALJ's reasons for discounting Dr. Khooblall's opinion – that it was vague and imprecise – were not supported by substantial evidence.  ECF Doc. 14-1 at 21-22. Instead, Jordan asserts that a review of the Dr. Khooblall's opinion shows that it was clearly articulated and consistent with other evidence in the record, including Dr. Khooblall's examination findings, other physicians' examination findings, diagnostic imaging, and other physicians' opinions.  ECF Doc. 14-1 at 21-22.

The Commissioner responds that the record supports the ALJ's conclusion that Dr. Khooblall's "checkbox form" was vague because Dr. Khooblall failed to quantify how much Jordan could lift, how long he could stand, and how often he could reach.  ECF Doc. 16 at 14. Further, the Commissioner argues that Jordan now seeks to "impermissibly . . . fill-in-the-blanks for Dr. Khooblall" by asserting that medical imaging and examinations supported his opinion. ECF Doc. 16 at 14.  Moreover, the Commissioner argues that the ALJ adequately controlled for evidence showing a reduction in Jordan's abilities – including Dr. Khooblall's opinion – by dropping the RFC finding from a reduced range of light work to a reduced range of sedentary work.  ECF Doc. 16 at 15.

Unlike treating physician opinions, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'"  *Gayheart*, 710 F.3d at 376.  Instead, the ALJ may proceed directly to the non-controlling-weight analysis and weigh such opinions based on: (1) the examining relationship; (2) the degree to which supporting explanations consider pertinent evidence; (3) the opinion's consistency with the record as a whole; (4) the physician's specialization related to the medical issues discussed; and (5) any other factors that tend to support or contradict the medical opinion.  *Id.*; 20 C.F.R. §§ 404.1527(c), 416.927(c).  Generally,

an examining physician's opinion is due more weight than a nonexamining physician's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Gayheart*, 710 F.3d at 375.  An ALJ does not need to articulate good reasons for rejecting a nontreating or nonexamining opinion. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (declining to address whether an ALJ erred in failing to give good reasons for not accepting non-treating physicians' opinions).

The ALJ applied proper legal standards and reached a conclusion supported by substantial evidence in assigning weight to Dr. Khooblall's opinion and in how she explained that finding.  Because Dr. Khooblall was not a treating physician, the ALJ was not required to give "good reasons" for rejecting his opinion.  *Smith*, 482 F.3d at 876.  Nevertheless, the ALJ explained that Dr. Khooblall's opinion was due "little weight" because Dr. Khooblall used vague, imprecise terms and did not quantify or define Jordan's limitations.  (Tr. 37).  And the Sixth Circuit has regularly held that an ALJ is permitted to discount an opinion as "vague" when it fails to provide useful, objectively measurable guidance as to the claimant's specific limitations.  *See Gaskin v. Comm'r of Soc. Sec.*, 280 F. App'x 472, 476 (6th Cir. 2008); *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 117 (6th Cir. 2016); *Quisenberry v. Comm'r of Soc. Sec.*, 757 F. App'x 422, 431 (6th Cir. 2018).  Further, substantial evidence supported the ALJ's conclusion that Dr. Khooblall's opinion was vague and imprecise, including Dr. Khooblall's failure to: (1) state how long Jordan could stand, sit or walk; (2) state how much weight or how much time in an average workday Jordan could be expected to push, pull, or reach; or (3) otherwise define what he meant when he said Jordan was "extremely limited" in walking and had "moderate limitations" in standing, pushing, pulling, bending, reaching, and repetitive foot movements."  (Tr. 679).  Moreover, the problem applying the vague, imprecise terms in Dr. Khooblall's opinion was demonstrated at the ALJ hearing.  *See* (Tr. 59) ("I see where

33

[Dr. Khooblall] puts in here function limitations are moderate and doesn't describe and no one defines what moderate is.").  Thus, because the ALJ's conclusion that Dr. Khooblall's opinion used vague and imprecise terms that failed to provide useful guidance regarding Jordan's abilities was reasonably drawn from the record, the ALJ's decision to assign "little" weight to Dr. Khooblall's opinion (Tr. 37) fell within the Commissioner's "zone of choice" and cannot be second-guessed by this court.  *Mullen*, 800 F.2d at 545.

Accordingly, the ALJ's evaluation of Dr. Khooblall's opinion must be affirmed.

**E.      Left Upper Extremity Limitation in the RFC**

Jordan argues that the ALJ erred by failing to incorporate into her RFC finding a limitation related to his left shoulder impairment.  ECF Doc. 14-1 at 22-24.  Specifically, Jordan asserts that the evidence in the record (his testimony and Dr. Khooblall's opinion) demonstrated that his left shoulder impairment caused limitations in such activities as pushing, pulling, reaching, lifting, and carrying.  ECF Doc. 14-1 at 23.  And he says that the ALJ's failure to include such a limitation in the RFC finding was not harmless because: (1) the VE testified that none of the light exertion jobs he identified would be available if a hypothetical individual were precluded from overhead reaching; and (2) the VE's testimony that the sedentary jobs he identified would be unaffected by such a limitation was inconsistent with the Dictionary of Occupational Titles.  ECF Doc. 14-1 at 23-24.

The Commissioner responds that substantial evidence – including Dr. Bolz's and Dr. Manos's opinions – supported the ALJ's decision not to include an additional reaching limitation in Jordan's RFC.  ECF Doc. 16 at 15.  Further, the Commissioner argues that any additional reaching limitation would not have precluded Jordan from performing sedentary work because: (1) the VE testified that there were jobs at the sedentary level that required only

occasional reaching and no overhead reaching; and (2) the VE's testimony was consistent with the VE's reading of the DOT and based on the VE's experience, knowledge, education, and training.  ECF Doc. 16 at 15-16.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e).  The RFC is an assessment of a claimant's ability to do work despite his impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

Notwithstanding the ALJ's failure to apply proper legal standards in evaluating Dr. Rhiew's opinion, the ALJ applied proper legal standards and reached a conclusion supported by substantial evidence in declining to incorporate into the RFC limitations based on Jordan's left shoulder impairment.  Here, the ALJ complied with the regulations by "consider[ing] all symptoms" in light of the medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e); (Tr. 29).  Further, the ALJ gave a thorough summary of Jordan's subjective complaints, the objective medical evidence, and the medical opinion evidence – specifically discussing Jordan's testimony and Dr. Khooblall's findings related to his left shoulder.  (Tr. 29-36).  And substantial evidence supports the ALJ's decision not to incorporate into the RFC limitations based on Jordan's shoulder impairment, including: (1) treatment notes indicating that Jordan could move all of his extremities, had normal muscle bulk and tone, could perform physical therapy

35

exercises; (2) Jordan's statements denying joint or muscle pain other than in his back and denying any weakness; (3) Dr. Goomber's December 2016 and May, October, and December 2017 notes indicating that Jordan did not have any subluxation noted on movement of his bilateral upper extremities; and (4) Dr. Rhiew's March 2017 notes indicating that Jordan had normal arm strength and movement.  (Tr. 626, 636-37, 642-43, 656, 796, 807-08, 880-82, 870-72, 875-77).  Thus, the ALJ's decision not to incorporate into the RFC additional limitations based on Jordan's left shoulder impairment was reasonably drawn from the record and fell within the Commissioner's "zone of choice."  *Mullen*, 800 F.2d at 545.

Accordingly, this court must affirm the ALJ's decision not to incorporate into the RFC additional limitations based on Jordan's left shoulder impairment.  Nevertheless, many of the limitations that Jordan advocates should have been imposed based on his left shoulder impairment appear within Dr. Rhiew's opinion and are based on Jordan's back impairments – *i.e.*, pushing, pulling, reaching, and lifting limitations.  And, because this court has determined Jordan's case should be remanded for the ALJ to apply proper legal standards in evaluating Dr. Rhiew's opinion, it is possible that the ALJ might change Jordan's RFC for the March 2015 through November 2018 RFC period to incorporate similar limitations to those he now advocates.

**VI.    Conclusion**

Because Jordan has failed to show that his "new evidence" is chronologically relevant to his claims, his request for a Sentence Six remand is DENIED.  Nevertheless, the ALJ failed to apply proper legal standards in weighing Dr. Rhiew's opinion; that failure was harmless only with respect to the August 2013 through March 2015 RFC period but not the March 2015 through November 2018 RFC period; and the ALJ otherwise applied proper legal standards and

reached a decision supported by substantial evidence in evaluating Dr. Khooblall's opinion and Jordan's left shoulder impairment.  Accordingly, the ALJ's decision: (1) concluding that Jordan was not disabled from August 15, 2013 through March 5, 2015 is AFFIRMED; and (2) concluding that Jordan was not disabled from March 6, 2015 through November 14, 2018 is VACATED AND REMANDED for the ALJ to apply proper legal standards in evaluating Dr. Rhiew's opinion.

     IT IS SO ORDERED.

Dated: September 15, 2020

                                                    Thomas M. Parker
                                         United States Magistrate Judge